## THE FEDERAL TRUST COMPANY

*v.*

## ALBERT A. GUIGUES et al.

[Decided November 24th, 1909.]

1. Where a building was commenced before the execution of a mortgage on the property, valid lien claims have priority over the mortgage.

2. Where a hardware materialman's contract required complete delivery for thirty days before payment on an architect's certificates, and the materialman, on visiting the property to make the final delivery, found considerable of the hardware furnished scattered throughout the second story of the building, whereupon he collected such material, refinished part of it, and delivered it with the final installment to the architects,

but did not obtain a certificate from them until after they had been discharged by the owner, there was no sufficient delivery to constitute a compliance with the contract so as to entitle him to a lien.

3. An action will not lie to recover moneys due on a building contract providing for an architect's certificate as a condition precedent, unless the certificate is produced or its production excused by the evidence.

4. A mechanics' lien claimant, having contracted to finish the plumbing, gasfitting and metal work of a dwelling-house for $2,950, completed the work, except connecting the kitchen range, on September 25th, 1907. The owner did not furnish the range until March, 1908, whereupon claimants, on March 25th, connected it by the services of two men for four hours, their lien claim being filed June 25th, 1908.—*Held*, that the work done on March 25th was not trivial, but a substantial portion of the contract required to complete the same, and was therefore sufficient to start anew the time within which claimant was required to file his claim.

5. The testing of the plumbing. gas, and metal work in a building to ascertain whether it was properly done was a part of the contract for which no charge could be made for extra work.

6. Where a member of a firm of architects employed to supervise the construction of a building visited the premises at a time when no work was being done, and had not been done for two or three months, the visit was insufficient to keep the architect's lien for services alive.

7. Where an architect visited the premises on which a building he was supervising was being erected to take care of the place, and see that things were safe and to serve notice on the contractors to finish their work, if anyone was working, such acts were within his duties as architect, and were sufficient to start a new period for filing the lien.

8. Where the carpenter contractor for the construction of a building always stood ready to finish the work, but was not permitted to do so, both because of a difficulty between the owner and the architects and their subsequent discharge, and the fact that the contractor could not work under the detailed drawings submitted, and also because of the owner's financial embarrassment, the contractor's failure to complete the work and to furnish an architect's certificate, as required by the contract, was no objection of his right to a lien.

9. Where property covered by a mortgage consisted of a dock lot used by the owner as a landing place for his yacht and separated from the mansion-house, also mortgaged, by a public highway, the house lot being bounded on three sides by a street, lien claims for labor and materials furnished in the construction of the house would be regarded as liens on the house and lot only as against the mortgage.

10. The Mechanics' Lien law (*P. L. 1898 p. 546 § 21*), declaring that when the curtilage of a lot on which a building is erected shall not be surrounded by an enclosure separating it from adjoining lands of the same owner, then the lot on which the building shall extend shall be such tract as in the place of its location is designated as a building lot, &c., but in no case to exceed one-half acre, had no application to lien claims for work and materials on a mansion-house located on a lot bounded on three sides by public streets and on the other by the property

of an adjoining owner and separated from a water lot, which the owner used as a landing place for his yacht, by a public street.

11. Where several mechanics' lien claims for labor and material performed in the construction of a building were all of one character, and there was nothing in the circumstances which would authorize priority of one over the other, they were all of equal rank.

On final hearing on bill, answer, replication and proofs.

*Mr. John R. Hardin,* for the complainant.

*Mr. Charles C. Hommann,* for Kelly & McAlinden Company.

*Mr. Albert C. Pedrick,* for the Cort Hardware Company.

*Mr. Michael Tansey* and *Mr. Joseph A. Connolly,* for Pigott & Mathesius.

*Mr. James S. Wight,* for Ira R. Crouse.

HOWELL, V. C.

This suit is brought to foreclose a mortgage made by the defendants Albert A. Guigues and wife to secure the payment of the sum of $10,000 and interest. The mortgage is dated May 27th, 1907, and was duly lodged for record in the clerk's office of the county of Middlesex on May 28th, 1907. It covers two tracts of land in Perth Amboy. The first is bounded by Rector, Lewis and Water streets, and lands of one Runyon; the second is a dock lot lying easterly of the first lot and separated from it by a narrow public highway called Water street. At the time of the making of the mortgage there was in course of construction on the first tract a dwelling-house of large proportions, the contract price of which was upwards of $33,000, and towards the erection of which four of the defendants claim to have performed labor and furnished materials. The debts claimed by them respectively therefor not having been paid, they filed lien claims under the provisions of the Mechanics' Lien law against both tracts, and in consequence were made parties defendant to this suit.

The building was commenced before the execution of the mortgage and the situation is therefore such as that if the lien claims are valid under the provisions of the lien law they have priority over the complainant's mortgage.

Two questions are raised by the complainant against each of the lien claims. The first one concerns the validity of the claims under the lien law, and the second touches the size of the curtilage. I will take up the claims *seriatim*.

### CORT HARDWARE COMPANY CLAIM.

This claim arises out of an agreement dated September 29th, 1906, between the Cort Hardware Company and the defendant Guigues, and provides for furnishing all the hardware for the dwelling-house in question. It provided in article IX. that the sum to be paid by the owner for the said materials was $442, to be paid to the contractor in current funds only upon certificates of the architects, but in one payment when all was furnished complete and within thirty days after the delivery. It appears that up to November 19th, 1907, the Cort Hardware Company had furnished considerable of the hardware provided for by this contract, and that the hardware had been put in place throughout the second story, and possibly some other portions of the building, and that there remained in the building a considerable portion which had not yet been attached. On that date the president of the company went with one of the architects to the building for the purpose of delivering the final installment of the hardware. This final installment he carried with him. When they arrived at the building they found the hardware which had not been attached to the building scattered about, and the architect, in the presence of the president of the claimant, had the hardware packed into a barrel and shipped to the claimant at Newark. The claimant's president did not deliver the final installment, but carried it back to Newark with him, and the claimant then took into its possession all the hardware which had been shipped from the Perth Amboy house, checked it up and repolished some of it, and then delivered the same to the architect,

in whose possession the same now appears to be. I do not see how this series of facts can be construed into a delivery under the contract above mentioned. There was no final delivery, and there was no proper certificate by the architects named in the original contract, as the arbiters on the claimant's work. It appeared in the testimony that a controversy arose between the owner and his architects which resulted in their discharge by him in the month of September, 1907. The Cort Hardware Company did procure from these architects a certificate that they had furnished labor and material in pursuance of their contract amounting to $465.53. This I understand to be the full amount of their claim, but it was procured on February 11th, 1908, long after Pigott & Mathesius had been discharged by the owner, and therefore as a certificate under the contract could have no force or effect. It is well settled that an action will not lie for moneys due upon a building contract which provides for an architect's certificate unless the certificate is produced or its production excused by the evidence. In *Byrne* v. *Sisters of St. Elizabeth* (*1883*), *45 N. J. Law* (*16 Vr.*) *213*, Mr. Justice Knapp, in the supreme court, declared the rule for that tribunal. The statement made by him in his opinion touching the competency of a court of equity to grant relief relates only to some supposed fraudulent action of an architect in withholding the certificate. This court cannot give any relief of that nature in this case for the reason that the pleadings are not properly framed for the purpose. The right claimed by the lien claimants is a legal right, and it must be dealt with in this court, as in a court of law, upon legal principles. The claim was drawn into this court not by reason of anything in the pleadings or in the jurisdiction of the court over the legality and validity thereof, but because the pleadings required a settlement of the question of priorities, and this question drew along with it the question of validity. Two years later Vice-Chancellor Van Fleet in this court came to the same conclusion in the case of *Kirtland* v. *Moore* (*1885*), *40 N. J. Eq.* (*13 Stew.*) *106*. This rule was announced recently by the court of errors and appeals in *Sheyer* v. *Pinkerton Construction Co.*, *59 Atl. Rep. 462*.

The result is that this claim must be disallowed

## KELLY & M'ALINDEN COMPANY CLAIM.

This claim arises out of a contract for plumbing work upon the house in question. The plumbing contract was first taken by a man named Joyce, who failed, and Kelly & McAlinden Company undertook to finish the work. They made a new and special contract with the owner on January 28th, 1907, which provided that they should furnish all the work for the completion of the plumbing, gasfitting and metal work required for the house for $2,950. Their payments were to be made as the work progressed, monthly, to the amount of eighty per cent. of the value of labor and materials furnished. The remaining twenty per cent. was to constitute the final payment.

The first objection to this claim is that the lien had expired before the claim was filed. The lien claim was filed June 29th, 1908. Kelly & McAlinden swear that the last work that was done by them on the contract was done March 25th, 1908. That turned out to be four hours' work by two men who were engaged in connecting up the kitchen range. They had done no work on the building previously to this time since September 25th, 1907. The reason why they were delayed in finishing their work was that the owner did not furnish the range until March of 1908; hence the claimants could not put it in place and connect it up. In my opinion the work that they did on March 25th, 1908, was not trivial, but was a substantial portion of the contract, and was required in order to finish it up. I therefore conclude that the lien claim was filed in time.

During the progress of the work the architects furnished to the Kelly & McAlinden Company two certificates, the first one for $1,293.87, and the second one for $1,018.13, making altogether $2,312, on account of which they were paid $1,000, leaving due to them $1,312 on account of the contract. Their lien claim includes $202.36 for extra work, a portion of which should be disallowed. The items charged under date of March 14th were for testing the work which had been done by Joyce, and should be disallowed, because it is part of the contract to see that the work is properly done, and although there was some evidence

that the architects had given an order for it the fact turned out to be that the testing was done before the order was given. These two items, amounting to $7.30, will therefore be disallowed. The item charged under date of March 25th, $33.60, appears to have been ordered by the architect as agent for the owner, and should be allowed. The item of March 13th to 30th, amounting to $106, appears to me to be a part of the original contract, and should be disallowed; and the same is true of the charges under date of March 28th to April 3d, amounting to $18. They are part of the original contract. Concerning the remaining items there is very little satisfactory evidence outside of the general statement that they were ordered by the architect.

My conclusion as to this claim is that it should be allowed for $1,312, and in addition thereto the items for extra work, excepting those which are disallowed.

## PIGOTT & MATHESIUS CLAIM.

The claimants in this case are the architects of the building. Their claim was filed January 31st, 1908. The principal objection to this claim is that the lien had expired before the lien claim was filed. Mr. Pigott, one of the firm, visited the premises on November 19th, 1907, in company with Mr. Birkenmeier, president of the Cort Hardware Company, but inasmuch as no work was being done at that time, and apparently there had been no work done on the building for some two or three months previous, it can hardly be claimed that that visit was sufficient to keep the lien alive. The visits made by Mr. Pigott to the building before that time were made in October. His account of railroad expenses shows that he was at the building October 17th and 24th. Previous to that Mr. Pigott was at the building on September 3d and 27th; at that time the plumber was working, the stucco man was fixing up defects in his work, and another man was engaged in putting on weather strips; but when he went there in October the building was practically at a standstill. He says, however, he had to go down there to see that things were safe, to take care of the place, to see if anyone was

working, to serve notice on the contractors to finish their work. These were all within the scope of his duties as architect, and I think are sufficient to give vitality to the lien. The owner, Mr. Guigues, became dissatisfied with the work of Pigott & Mathesius, and some time in the month of December, 1907, he discharged them from his employment on this work. It is difficult from the testimony to determine who was at fault in this matter. The burden of proof is on Mr. Guigues. The evidence which he has adduced does not satisfy me that the architects did not comply with their contract.

Their claim will therefore be allowed for the sum of $1,229.41.

### IRA R. CROUSE CLAIM.

The lien claim in this case was filed on June 23d, 1908, and the testimony of the claimant is that the last work that he did on the house was about May 12th of that year. This claim arises out of a contract made on May 22d, 1906, between Ira R. Crouse and Albert A. Guigues, by which Crouse agreed to perform all the carpenter, mason and excavation work for the Guigues residence as shown on the specifications, for the sum of $16,526. The payments were to be made monthly to the extent of eighty per cent. of the value of the work performed up to the date of the architects' certificate, and the twenty per cent. held back was to constitute the final payment.

Mr. Crouse was never permitted to finish his contract, although he always stood ready to do so. The difficulty arose out of a controversy between the owner and the architects and their subsequent discharge from the owner's employ, and also from the fact that the claimant, Mr. Crouse, could not work from the detailed drawings, his reason being that the trim and wainscoting which was specified for the first floor of the house did not correspond with the requirements of the specifications prepared by the architects. There was another reason which arose out of the financial embarrassment of the owner. Mr. Crouse's work appears to have proceeded properly up to the time when the difficulties above mentioned became acute. He holds an archi-

tect's certificate for $800, dated April 27th, 1907, which has never been paid, and it appears that he never received any money from the owner after the date of that certificate. He worked on the building as long as it was possible for him to do so. The strained relations between the owner and the architects and their final discharge appears to have put it out of the power of Mr. Crouse to proceed any further. A Mr. Enstice was employed by the owner to superintend the construction of the building after the architects had been discharged, and as such he was an agent representing the owner, but he found it impossible to give proper instructions to Mr. Crouse, and Mr. Crouse was therefore obliged to stop work. This state of facts excuses Mr. Crouse from the production of any architect's certificate. In fact, there were no architects who could give him a certificate; certainly the architects agreed upon could not, and his claim will therefore be allowed as stated in the lien claim filed by him in the Middlesex county clerk's office. The amount stated by him in his testimony is $9,297.14.

All these claims will bear interest, and if counsel cannot agree upon the amount I will undertake to settle it.

### CURTILAGE.

The property covered by the complainant's mortgage includes not only the tract of land bounded by Water, Lewis and Rector streets, on which the mansion-house is situated, but includes also a dock lot abutting upon Raritan bay, but separated from the plot on which the mansion-house stands by a narrow street or driftway, which appears to be also a public highway. There is a controversy between the mortgagee and the lien claimants as to the size of the curtilage upon which the lien claims which have been allowed are to stand. It is quite apparent that the statute (*Mechanics' Lien law* § *21*) does not apply to the case, and that we must have recourse to the decisions which have been made on the subject in our state. In *Derrickson* v. *Edwards, 29 N. J. Law (5 Dutch.) 468,* it was held that the curtilage intended by

the act to be subjected to the lien should be so much land as might be necessary for the convenient and beneficial enjoyment of the building on which the claimant's work was done.   There seems to be no natural and necessary connection between the lot of land on which the mansion-house is erected and the dock lot separated from it by Water street.   It appears that the owner used the dock lot as a landing place for his yacht, but it had no necessary connection with the use of his dwelling-house.   The mansion-house lot is surrounded on three sides by streets, and is bounded on the north by lands of an adjoining proprietor.   There are on it the dwelling-house and a building used as a garage and coachman's quarters.   This plot seems to be complete in itself and not to require the dock lot as a ,necessary adjunct for its enjoyment.   The lien claims therefore will be held to be liens only on the mansion-house lot.

It need hardly be said that the lien claims are concurrent liens upon the premises to which they have been confined.   They are all of one character and there is nothing in any of the circumstances which could operate to give one priority over the other.   See *Mechanics' Lien law* § *20.*