## National Surety Company, et al. v. Price, et al.

(Decided February 10, 1915.)

Appeal from Jefferson Circuit Court
(Chancery Branch, Second Division).

1. Principal and Surety—Contractor's Bond—Notice of Claims Unpaid.—Where in a contractor's bond the obligee is required to withhold payments from the contractor, and to notify the obligor, after he has notice or knowledge of the fact, that any claim for labor performed or for materials or supplies furnished the contractor "remains unpaid," the words "remains unpaid" apply only to claims where payment has been demanded and either refused or neglected for an unreasonable length of time.

2. Principal and Surety—Contractor's Bond—Notice of Claims Unpaid—Evidence.—In an action on a contractor's bond requiring the obligee to withhold payments to the contractor, and notify the obligor, after he has notice or knowledge of the fact that any claim for labor performed or for materials or supplies furnished the contractor remains unpaid, evidence examined, and held that the obligee did not pay out money, or fail to notify the obligor within a reasonable time after having notice or knowledge of the fact that certain claims of the sub-contractors remained unpaid.

3. Mechanics' Liens—Statutory Notice of Intention to Claim Lien—Time.—Where the principal contractor abandons his contract, and the sub-contractors are told by the owner to go on and complete the work, the time for giving the statutory notice of an intention to claim a lien should date, not from the time the last item was furnished while the contractor was in charge, but from the time the last item was furnished after the owner directed the sub-contractors to go ahead and complete the work.

4. Mechanics' Liens—Credit.—It is not error to credit a sub-contractor by the amount of a note executed by the principal contractor to him, and discounted by a bank, though the note still be held by the bank, where it appears that the contractor is insolvent and the sub-contractor will have to pay the note.

5. Mechanics' Liens—Notice of Intention to Claim Lien—Additional Work—Extension of Time.—Where additional work or material is not only required by the contract, but is furnished at the request of the owner, it will extend the time for giving the statutory notice of an intention to claim a lien.

6. Mechanics' Liens—Notice of Intention to Claim Lien—Sufficiency. —A notice which fails to state the amount for which a mechanics' lien will be claimed is insufficient.

7. Assignments—Existence of Fund.—An equitable assignment will be created only where there is a fund in existence belonging to the assignor.

8. Mechanics' Liens—Personal Judgment—Evidence.—Where a sub-contractor claimed a personal judgment against the owner on

the ground that the owner made a binding promise to pay, evidence considered, and held that the chancellor did not err in holding that no such promise was made.

9. Interest—Funds Retained by Owner.—Where a part of the contract price is retained by the owner, it is not error to charge him with interest after suit has been brought to settle the questions of liens and adjust the liability of the surety on the contractor's bond, where the owner fails to pay the money into court.

10. Principal and Surety—Contractor's Bond—Attorneys' Fees.— Where a contract between the owner and the principal contractor provides "that the contractor shall refund to the owner all moneys that the latter may be compelled to pay in discharging any liens on said premises made obligatory in consequence of the contractor's default," a bond executed by a surety company guaranteeing the faithful performance of the contract by the contractor does not cover attorneys' fees incurred in resisting mechanics' liens.

JOHN BRYCE BASKIN, M. A., D. A. & J. G. SACHS and BENJAMIN SACHS for appellants.

FRED FORCHT, JR., P. J. COSGROVE, WM. F. CLARK, JR., FURLONG, WOODBURY & FURLONG, PRYOR & CASTLEMAN and DAVID R. CASTLEMAN for appellees.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Affirming on original and cross-appeals.

In February, 1912, W. B. Price contracted with Nicholas Collett to build for him a residence in Audubon Park, a suburb of Louisville, for the sum of $9,200. To insure the performance of the contract Collett executed and delivered to Price a bond with the National Surety Company as surety. Work on the building was begun in the month of March. About the first of September Collett began to default. The local agent and representative of the bonding company was notified. On September 26th formal written notice was sent to the bonding company that Collett had defaulted in the contract, and that the work would be completed under the supervision of the architect, as the contract required. Meyer was the architect, and had full authority to represent the owner.

This action was brought to enforce certain mechanics' liens on the property, and to determine the liability of the surety. The case was referred to the master commissioner to hear evidence and report. Several liens, aggregating $4,066.87, were allowed. The commissioner further reported that Price, the owner of the building, was entitled to a judgment for the amount of these

claims, subject to a credit of $1,928.82, the balance of
the contract price in his hands. The lien claim of Henry
J. Schoo was disallowed. Judgment was entered in con-
formity with the commissioner's report. From that
judgment the National Surety Company and Henry J.
Schoo appeal, and W. B. Price, the owner, prosecutes
a cross-appeal.

We shall first discuss the liability of the surety com-
pany. Sections 2 and 4 of the bond are as follows:

"2. The obligee shall, at the times and in the man-
ner specified in said contract, perform all the covenants,
matters and things required to be by the obligee per-
formed; and if the obligee default in the performance
of any matter or thing in this instrument, or in said con-
tract agreed or required to be performed by the obligee,
the company shall thereupon be relieved from all lia-
bility hereunder."

"4. If at any time during the prosecution of the
work specified in said contract to be performed there
come to the notice or knowledge of the obligee the fact
that any claim for labor performed or for materials or
supplies furnished the said principal in or upon said
work remains unpaid or that any lien or notice of lien
for such work, materials or supplies has been filed or
served, the obligee shall withhold payment from the
principal of any moneys due or to become due to the
principal under said contract until the payment of such
claim or the cancellation and discharge of such lien or
notice of lien, if any, and will so notify the company, giv-
ing a statement of the particular facts and amount of
each such claim, lien or notice of lien."

It is the contention of the surety company that it was
released from all liability under the bond by reason of
the fact that Price, the obligee, after having notice of
unpaid claims, not only failed to withhold payments to
the contractor, but also failed to give reasonable notice
of such facts to the surety company. To determine this
question it will be necessary to give a somewhat detailed
statement of the evidence.

As before stated, Meyer was Price's agent for the
purposes of the contract. The work on the contract was
begun in March, 1912. The Corey-Scheffel Lumber Com-
pany delivered $75.24 worth of lumber on April 9th. On
April 12th that company wrote to the architect that that
much lumber had been delivered. The letter also con-
tains the following statement:

"Mr. Scheffel advised that you will protect us on all material we notify you about. We hope that you will keep this matter confidential, as we do not care to have the matter get to Mr. Collett."

On May 15th a second letter was sent to Meyer, notifying him that $312.75 worth of lumber had been delivered up to that date. On May 20th a third letter was sent notifying Meyer that the firm had delivered $335.64 worth of lumber. Each of the letters contains a paragraph similar to the one above quoted. On May 21st Meyer wrote to the Corey-Scheffel Lumber Company, telling them that some time prior thereto he had written them that the matter would have to be brought to the notice of Mr. Collett, and that he could not make settlement unless he received an order through him. The letter also suggested that the firm get a settlement from Collett without troubling the writer. Mr. Scheffel testifies that he wrote the letter above referred to. Before 'he furnished the lumber he went to Meyer and told him that he would expect him (Meyer) to protect him. On June 10, 1912, he received $200 on his account. He possibly had four or five conversations with Meyer about getting his money. Meyer said that there would be enough to settle his claim. For this reason he was not uneasy about it until towards the end. Both before and after the credit he tried to get money from Meyer. When he received the $200 Collett gave him an order for it. When the payment was made it was satisfactory and he accepted it. He was in Meyer's office every two or three weeks after the payment and discussed the account with him. He was not looking to Collett for his money; he was looking for the architect and builder to protect him.

J. Guy Everet, who had a claim for the tin work and roofing, which was begun in April or May and not completed until the fall, testified that he received an order for $500 on July 20th. His whole debt was only $672. The $500 was all he asked for. The work was not entirely completed, and he was not in the habit of asking for full payment until the work was completed. The payment was satisfactory to him.

E. L. Hughes, a member of the Hughes-Byron Company, testified that after he had furnished about $200 worth of material, he asked payment on account, and was given an order by Collett on May 28th, for $150.

This order was presented to Meyer and paid. The only interview that he had with Meyer was at the time of this payment. The payment of the $150 on May 28th was entirely satisfactory. Thought that prior to that time he had talked to Meyer, and that after that time he also talked to Meyer about getting money, but was not positive as to this. Was not able to state any conversation he had had with Meyer, because practically he had had none about the money.

Henry Schoo testified that a day or two before he filed his mechanics' lien, during the month of September, he had a talk with Meyer in regard to his claim, and that Meyer promised that if he would go ahead and complete the work he would see that he was paid. On the question in controversy Mr. Meyer, the architect, testified on cross-examination as follows:

"Q. Mr. Meyer, when did you first learn that Collett was not paying his sub-contractors, or any of them? A. The first part of May, as a protection both to the owner and people—to protect one side as well as the other, we tried to keep track of the contractor—whether they were paying out to the materialmen the money we were paying out on the contract; and from time to time we noted any default with these people, and, as a matter of fact, Mr. Collett himself would tell us of different bills he had not paid, and promised to pay these bills. Q. When did that first begin? A. So far as they were not paid constantly, I heard from his contract—different bills he had not paid. Q. Along in April and May—as early as that? A. Corey-Scheffel Lumber Company—yes, in April and May, they claimed a bill of $300 and said he had given them but $200 on account, for which he gave me a receipt; and so he had paid them part of their account. I have got a receipt from him showing that he had paid it, but claimed he only owed them a balance of $89. I was keeping track of him, and the amount of money he was paying. Q. Did Corey-Scheffel, in their letter of April 12th, talk to you about the balance of $75 shown in their letter? A. Not about this. I don't know we ever had any discussion about that. You see, that is part of their whole statement. Q. Did you have any talk with them about the $312.75? A. They simply notified me. We were keeping track of him. Afterwards we took up this—this balance—and told them, as far as I knew at that time, in May, he was going to come out

all right on his contract. He was paying some part of them. Q. When did you have any conversation with any other sub-contractors about not getting their money? A. One or two. Only one other man came to me originally, and that was Henry Schoo, who put in a stairway, and after he finished he asked us about a payment on the thing. We asked him how much he had paid him. He said he was unable to get his money out of him. Q. When was that? A. I can't give you the exact date. I should say this was along about June—the right date, and this was the original bill. I have got a copy of his bill he mailed me. Q. That was about the last of June? A. I should say it was. Q. Didn't you have conversations with quite a number of those along in August? A. I don't doubt but what a number of these men took up this thing with me on the question of payment. From September 26—three or four weeks prior to that date—we had three or four of these men to talk it over, as well as from that time on, we likely had a lot of them —I couldn't give you the dates of them, after we refused to pay them.''

Subsequently, Mr. Meyer was recalled for further examination. In the meantime, he had read over his former deposition, and was also consulted by counsel for Price. On his recall he testified that there were two points in his former deposition that were not correct, one in regard to the Corey-Scheffel claim, and the other in regard to the Schoo claim. In his former deposition he stated that he knew of the default by Collett in April or May. At that time, however, there was no claim on the part of the Corey-Scheffel Company that Collett had refused to pay his bill, and the three letters in question were the only information he had on the subject. Some time after the payment of the $200 Scheffel told him that his bill had not been paid. How long after, he was not able to say. He was also mistaken in saying that Henry Schoo had asked him about a payment on his account in June. The conversation did not take place until after Schoo's work was finished, and that was some time in September. Witness also stated that he had no information or notice of any other claim being unpaid by Collett, except the two mentioned and the claim of J. D. Case, who was a sub-contractor. As to all the other claims involved, the evidence conclusively shows that Meyer had no knowledge of the fact that they were not paid until some time during the month of September.

Meyer's evidence further shows the following payments made by him:

"1912.  April 20   Nicholas Collett .................$  200.00
        April 26       "         .                  200.00
        May 3          "             .................  100.00
        May 17         "           .................  500.00
        May 27   Hughes-Byron Co., on acct.  150.00
        May 31                "          1,200.00
        June 14               "          1,500.00
        June 28               "            500.00
        July 19  Guy Everett .................  500.00
        Aug. 2   Central Planing Mill, on acct.
                    of Nicholas Collett.................  160.16
        Aug.  2  Nicholas Collett .................  500.00
        Aug. 16        "           ................. 1,000.00

                 Total.................$6,510.16''

   Before considering the effect of the evidence above set out, it becomes necessary to determine the proper construction of the words "remains unpaid" as applied to claims for labor and materials in the fourth clause of the bond. It is well settled that a bond like the one in question is an insurance contract, and should be construed so as to afford the insured the protection for which he paid. Lewis v. U. S. Fid. & G. Co., 144 Ky., 428; Champion Ice Mfg., &c. Co., v. American Bonding & Trust Co., 115 Ky., 863; Aetna Life Ins. Co. v. Bowling Green Gas Light Co., 150 Ky., 732; U. S. F. & G. Co. v. Allen Co., 122 Ky., 825; Hormel v. American Bonding Co., 33 L. R. A. (n. s.), 513. It will be observed that the bond does not fix a time that the claims shall remain unpaid. If the words should be held to apply to every claim remaining unpaid without regard to time or demand on the part of the claimant, it is manifest that the very purpose of the bond would be defeated. It would impose upon the obligee the absolute duty of protecting the obligor, and relieve the obligor of all liability under the bond. In our opinion, the claim must be due. There must be a demand for payment, and either a refusal or a neglect to pay for an unreasonable length of time; and the obligee should have notice or knowledge of these facts. With these principles in mind, let us examine the facts: The Corey-Scheffel Lumber Company made three deliveries of material in

April and May. The company's bill amounted to $335.64. As each delivery was made the company advised Mr. Meyer of the delivery by a letter, in which it stated that Mr. Scheffel had advised that he would protect them on material of which he was notified. At the same time the letter asked that he keep the matter confidential, as they did not care to have it get to Mr. Collett. There was nothing in any of these letters to indicate that payment had been demanded of Collett. On June 10th the payment of $200 was made on the account by Collett. Of the account there remained unpaid $135, according to Scheffel, and $89, according to Collett. Scheffel admits that this was a proper proportion of his account according to the custom of the building trade. Scheffel says that he expected no trouble in the settlement of the account. After this payment he continued to furnish other materials. While he claims to have been in Meyer's office every week or two, or every two or three weeks, after the payment, and discussed the account with him, it appears that his whole purpose was to secure the account through Meyer without troubling Collett about it. Nowhere does he show that he actually demanded payment or Collett refused. J. Guy Everett, whose claim amounted to $672, was paid $500 on July 20th. The payment was satisfactory, and was all he asked for. The Hughes-Byron Company account amounted to $200. When Hughes asked payment on account, he was given an order by Collett on May 28th for $150. The order was paid and the payment entirely satisfactory. There is nothing in the evidence to show that he ever demanded of Collett the payment of the balance. He was not able to state any conversation he had with Meyer, because "practically he had had none about the money." Appellant lays particular stress on the evidence of Meyer when cross-examined for the first time, and insists that Meyer's correction of these statements on his re-examination should not be credited, for the reason that the corrections were made on the suggestion of counsel for Price. Fairly considered, however, we think it clear that Price was mistaken in his original statement. He makes it clear that the only information he had in the spring in regard to the claim of the Corey-Scheffel Lumber Company was conveyed by the letters of that company, which certainly do not indicate that any demand for payment had been made,

and that payment had been refused or neglected for an unreasonable length of time. It is also clear that the conversation which he had with Scheffel did not take place in June. He stated that the conversation took place after the work was finished, and the work was not finished until September. Scheffel also claims that the conversation took place in September. It further appears from the evidence that the company, through its local agent, was fully apprised of all the facts with reference to Collett's default about September 1st, and that on September 26th written notice was given to the company. On the whole, it appears that where payment was demanded by claimants, satisfactory payments were made. They had no reason to expect full payment until their contracts were completed. It does not appear that the payment of any claim was refused or neglected for an unreasonable time after the claim became due and payment was demanded. In the light of all the circumstances, we agree with the chancellor that Price, through his authorized agent, did not pay out any money to Collett, or fail to give reasonable notice of the non-payment of any claim after he had notice and knowledge of such facts as would lead an ordinarily prudent person situated as he was to conclude that any claim remained unpaid within the meaning of the provisions of the bond.

2. The surety company next insists that the chancellor erred in adjudging that appellees, William B. Pell & Brother, Hughes-Byron Company, Miller & Sauer, G. W. Younger, and J. Guy Everett were entitled to liens on the property. We shall consider the validity of these liens in the order named.

(a) William B. Pell & Brother were allowed a lien for $679.04, with interest. As before stated, Collett, the contractor, abandoned the contract about September 26, 1912. Price, the owner, through his agent, Meyer, took charge of the work and finished it. On being asked whom he had employed to complete the contract, Mr. Meyer testified as follows:

"We used, as far as we could, sub-contractors on the work; that is, men he had—the sub-contractors with Mr. Collett. Where we had those men we told them the condition, and to finish what work they had. Where we had no such contract we employed other people. In doing that we had to use every day other people. Alfred

Struck Company, lumber; J. J. Campbell, plasterer; Lutz & Schmitt, bricklayers.''

Of the items composing the claim in question some of them were furnished while Collett was in charge, and some after the work was taken over by the owner. The lien statement was filed in time. The Act of March 22, 1910, as amended by the Act of March 18, 1912, Acts 1912, Chapter 115, page 389, contains the following provision:

''Provided that no person who has not contracted directly with the owner or his agent shall acquire a lien under this section unless he shall notify in writing the owner of the property to be held liable or his authorized agent, within thirty-five days after the last item of said material or labor is furnished, of his intention to hold said property liable, and the amount for which he will claim a lien.''

The notice required by the foregoing act was not given to the owner, Price, until about December 10, 1912. It is insisted by the surety company that the notice should have been given within thirty-five days after the last item was furnished under the contract with Collett, and while the latter was in charge, and that materials furnished after Collett abandoned his contract, and while the work was being finished by the owner, can not be considered for the purpose of determining whether or not the notice was given in proper time.

There is eminent authority to the effect that where, under a statutory provision, the right of a contractor, laborer or materialman to a lien for labor performed or materials furnished, depends upon the filing of a statement of claim or a notice to the owner, or the commencement of proceedings to enforce the lien within a prescribed period after the labor is performed or material furnished, the necessary steps to establish the lien must be taken within the time specified under the contract, and after such contract is completed and closed, the time cannot be extended or the right revived by furnishing material or performing labor under a new and independent contract, and tacking the same to the original contract. Duffy v. Baker, 17 Abb. N. C., 357; Cahoon v Fortune Min. & Mill. Co., 26 Utah, 86, 72 Pac., 437; Miller v. Heath, 22 Pa. Super. Ct., 313; Gilbert v. Tharp, 72 Iowa, 714, 32 N. W., 24; Chase v. Garver Coal Co., 90 Iowa, 25; 57 N. W., 648; National L. Ins. Co. v.

Ayres, 111 Iowa, 200, 82 N. W., 607; John T. Noye Mfg. Co. v. Thread Flouring Mills Co., 110 Mich., 161, 67 N. W., 1108; Schulenberg v. Vrooman, 7 Mo. App., 133; Nye & S. Co. v. Berger, 52 Neb., 758, 73 N. W., 274; Hudnit v. Roberts, 10 Phila., 535; Inman v. Henderson, 29 Or., 116, 45 Pac., 300; Lane & B. Co. v. Jones, 79 Ala., 156; Jones v. Swan, 21 Iowa, 181; Crawford v. Blackman, 30 Kan., 527, 1 Pac., 136; Cocheco Bank v. Berry, 52 Me., 293; Maryland Brick Co. v. Dunkerly, 85 Md., 199, 36 Atl., 761; Livermore v. Wright, 33 Mo., 31; Henry & C. Co. v. Fisherdick, 37 Neb., 207, 55 N. W., 643; Spencer v. Barnett, 35 N. Y., 94; Kunkle v. Reeser, 5 Ohio, N. P., 401.

The rule above announced, however, has no application to the facts of this case. Here it is not sought to tack material furnished under two separate and independent contracts for the purpose of extending the time for filing the notice. The contractor abandoned his contract. The owner did not make a new and independent contract with the appellee Pell. Through his authorized agent he told him to go ahead and finish the work. There was no change in the contract price or in the amount of materials to be furnished. The materials being required by the original contract, and that contract having been continued and adopted by the owner, and the materials having been supplied at his request, the time for giving the statutory notice should date, not from the time the last item was furnished while the contractor was in charge, but from the time the last item was furnished after the owner had told appellee to go ahead and complete his work. St. Louis National Stock Yards v. O'Reilly, 85 Ill., 546; Holden v. Winslow, 18 Pa., 160; Nichols v. Culver, 51 Conn., 177. The claim of appellee was, therefore, properly allowed.

(b) The facts with reference to the Hughes-Byron Company claim and the Miller & Sauer claim present the same questions, and, for the same reasons, these claims were properly allowed.

(c) The first contention with reference to the claim of G. W. Younger & Co. is that it should have been reduced by the sum of $50, represented by a note executed by the contractor to Younger, and discounted by him at the Commercial Bank & Trust Co., as the evidence fails to show that he had ever taken the note up. We are not disposed, however, to reverse the judgment in favor

of Younger on this ground. It appears from the entire record that Collett is insolvent. Whether Younger has taken up the note in question or not is, therefore, immaterial. He is liable to the bank, and will, therefore, have to pay the note. Under these circumstances, the proceeds of the note cannot be regarded as a credit. In its essential features the facts of this claim do not differ materially from those involved in the claim of William B. Pell & Bro., and for the same reasons a lien on the property was properly adjudged.

(d) The lien claim of J. Guy Everett is attacked on the ground that Everett practically concluded his work under the contract by August 21st, and the written notice was not given until November 11th. It is admitted that Everett did $12 worth of work in the month of October, but it is argued that as this item was for extra work, it cannot be considered in determining whether or not the notice was in time. The only evidence as to this item is that of Everett, who stated that the item was for tile work on a shed. When the shed was built it was too flat for tiling. The builders told him to put tin on it. This he did. The architects then notified him that the plans called for tiling, and they wanted tiling on it. In pursuance to their direction, he placed the tiling on the shed. It is the general rule that where the work contracted for is completed according to contract, but the contractor later discovered defects and voluntarily undertakes, after the time for completing the contract has expired, and without authority of the owner, to remedy the trouble, especially where the work or material is trivial, such work does not extend the time for filing. Sulcer Boat Machine Co. v. Rushville Water Co. (Ind. App.), 62 N. E., 649; Hartley v. Richardson, 91 Me., 424, 40 Atl., 336; Lippert v. Lassar (Cal.), 33 Pac., 797. Particularly is this the case where the contractor performs the work, not because of any obligation to do so, but for the sole purpose of enabling him to extend the time for giving the statutory notice. Wolfling-Luring Lumber Co. v. Mosely, 152 Ky., 701. Where, however, the service or material is not only required by the contract, but is furnished at the request of the owner, it will extend the time for claiming a lien, or will revive an expired lien as to the contract theretofore substantially completed. St. Louis National Stock Yards v. O'Reilly, 85 Ill., 546; Holden v. Winslow, 18 Pa., 160; Nichols v.

Culver, 51 Conn., 177; Home Brewing Co. v. Johnson, 41 Ind. App., 44, 83 N. E., 358; McLean v. Wiley, 176 Mass., 233, 57 N. E., 347; Miller v. Wilkinson, 167 Mass., 136, 44 N. E., 1083; Monaghan v. Putney, 161 Mass., 338, 37 N. E., 171; Hubbard v. Brown, 8 Allen, 590; E. R. Darlington Lumber Co. v. J. T. Smith Bldg. Co., 134 Mo. App., 316, 114 S. W., 77; Federal Trust Co. v. Guigues, 76 N. J. Eq., 495, 74 Atl., 652; Stidger v. Mc-Phee, 15 Colo. App., 252, 62 Pac., 332; McIntyre v. Tautner, 63 Cal., 429; Whitcomb v. Roll (Ind. App.), 81 N. E., 106; Gordon Hardware Co. v. San Francisco & S. R. Co., 86 Cal., 620, 25 Pac., 125; Bruce v. Berg, 8 Mo. App., 204; General Fire Extinguisher Co. v. Schwartz Bros. Commission Co., 165 Mo., 171, 65 S. W., 318; Worthen v. Cleaveland, 129 Mass., 570. Here the work in question, though called extra, was required by the specifications, and was performed because the owner's authorized agent directed the sub-contractor to do so. Under the rules above announced, the time for filing the statutory notice was thereby extended.

(e) The next question to be considered is the propriety of the court's action respecting the claim of Henry J. Schoo. The notice given by Schoo was to the effect that he had filed in the office of the Jefferson County Court a mechanics' and materialman's lien, asserted by him against the property owned by Price. The statute requires notice of the claimant's intention "to hold said property liable and the amount for which he will claim a lien." Even if it be conceded that notice of the filing of the lien was notice of Schoo's intention to hold the property liable, the notice was defective because of its failure to state the amount for which he would claim a lien. In such a case the law does not impose upon the owner the duty of examining the records in the clerk's office for the purpose of determining the amount. The notice itself must specify the amount, and where no amount is specified the notice is not sufficient. Wolfing-Luring Lumber Co. v. Mosely, 152 Ky., 701; Wright v. Monroe Lumber Co., 156 Ky., 83. After Schoo was denied a mechanics' lien he offered an amended pleading, claiming, first, a lien by equitable assignment, and, second, a personal judgment against Price because of an alleged promise by Price's architect to see that he was paid. The amended pleadings were offered to conform to the proof. The chancellor refused to permit them to

be filed on the ground that they were not sustained by the proof. The facts are these: On September 21st Collett gave Schoo an order on Meyer for $150. At that time Collett had ceased work, and there was nothing coming to him under his contract. As an equitable assignment can be created only where there is a fund in existence belonging to the assignor, the relief on this phase of the case was properly denied. On the promise of payment made by Meyer, Schoo testifies that a day or two before the completion of the contract he asked Meyer about getting his money; whereupon Meyer said, "Go ahead and finish up, and I will see you get your money or authorize this." Meyer denied having such a conversation. On this evidence the chancellor refused to give a personal judgment against the owner, and we see no reason to disturb his finding.

On the cross-appeal of Price it is first insisted that the chancellor erred in charging Price with interest on the balance of the contract price in his hands from the date suit was filed to the date of the judgment. It is argued that this was error because Price was a mere stakeholder, and had the right under the contract to retain the money until the question of liens was adjudicated. As between Price and the lien claimants, the money in equity belonged to those who finally established their liens. As between Price and the surety company the surety company was liable to Price at the time of the filing of the action for the difference between the sum which he had in his hands and the full amount of the lien claims which were finally established. Under these circumstances the only way by which Price could relieve himself of the burden of interest was to pay the money into court. This he failed to do, and he was, therefore, properly charged with interest.

It is next insisted that Price should have been allowed his attorneys' fees against the surety company. The argument is this: The surety company guaranteed that the contract would be faithfully performed by Collett. The contract provided "that the contractor shall refund to the owner all moneys that the latter may be compelled to pay in discharging any liens on said premises, made obligatory in consequence of the contractor's default." The attorneys were employed to resist the liens. They succeeded in defeating liens amounting to $1,200. It is insisted that money paid in defeating liens is in effect

money paid in discharging liens; for, if not defeated, they would have had to be discharged, and for the sum paid in their discharge the surety company would be clearly liable. It is true that this court has upheld the allowance of attorneys' fees incurred in resisting eviction where the contract indemnified the obligee "against all loss caused and damage growing out of or on account of any defect in the title." Robertson v. Lemon, 2 Bush, 301; Mercantile Trust Co. v. South Park Residence Co., 94 Ky., 271. It is also true that the same rule was followed in the case of Southern Ry. New Co. v. Fidelity & Guaranty Co. of New York, 26 Ky. L. R., 1220; but there the insurer engaged at its own cost and expense to conduct a trial or defense, but failed to do so. And in the case of Allen Co. v. U. S. F. & G. Co., 122 Ky., 825, the court allowed a recovery on a bond for such items of special damages as the architects' commission and the expense incurred in letting the contract. Here, however, the action is based on Collett's obligation to discharge the lien, and the surety's obligation to see that this provision of the contract was faithfully performed. It is not a contract to indemnify the owner against all loss or damage by reason of the contractor's default in paying the mechanics' liens, but is a contract simply to indemnify the owner against such sums as he might be required to pay in discharging liens which the contractor should have discharged. The surety's liability is fixed by the plain terms of the bond, considered in connection with the building contract itself; and there is nothing from which it can be reasonably inferred that its liability should extend to attorneys' fees incurred in resisting mechanics' liens. Furthermore, the surety was represented by counsel in the action, who also took an active part in resisting the liens in question. We, therefore, conclude that the attorneys' fees were properly disallowed.

Judgment affirmed both on original and cross-appeals.